ROTHSCHILD & CO. *et al.*

*v.*

THE CITY OF CHICAGO *et al.*

*Opinion filed April 18, 1907—Rehearing denied June 6, 1907.*

1. MUNICIPAL CORPORATIONS—*right of elevated railroad to provide means of access to stations.*  A railroad company seeking to construct an elevated railroad in the streets of a city must comply with such restrictions as the city sees fit to impose in granting·the license, but if the license is accepted and there is no restriction prohibiting the railroad from constructing a passageway from its station platform to an adjacent private building to provide an additional means of access to its station, it may make such terms with the owner of the building as it sees fit, provided the passageway is not actually an unlawful obstruction of the public street and the use of the building by the public as a means of access is unrestricted.

2. SAME—*fact that building where station is maintained is not owned by railroad is not material.*  The fact that the building in which an elevated railroad maintains a station, connected by a passageway with its platform, is owned by a corporation which conducts a department store in the building, does not make the use a private one, where the public are entitled to free use of the building, its stairways, passenger elevators, etc., in reaching the waiting room and station platform, at all times when the building is open; nor does the fact that the ticket office is in the passageway, and not in the building, make the use of the building a private one.

3. SAME—*effect of city's offer to allow a passageway to be constructed for an annual rental.*  If a passageway constructed from an elevated station platform to an adjacent private building is, in fact, an unlawful obstruction of the street, the fact that the city offered to allow the same to be built if an annual rental was paid to the city would not deprive it of its right to have such structure removed; but the fact that such offer was made tends to show that the city did not regard the structure as an obstruction of the street or as a menace to public health, and a nuisance.

4. SAME—*a passageway from an elevated station platform to adjacent building not an unlawful obstruction of street.*  A passageway from the platform of a regular station of an elevated railroad to the second story of an adjacent private building, in which are provided waiting rooms, toilet rooms, stairways and passenger elevators, which afford an additional means of access to the station platform and which are used by the public without restriction and with much added convenience, is not such an unlawful obstruction of the street as is beyond the power of a city to sanction.

APPEAL from the Appellate Court for the First District;— heard in that court on writ of error to the Circuit Court of Cook county; the Hon. LOCKWOOD HONORE, Judge, presiding.

JUDAH, WILLARD & WOLF, and WILLIS E. THORNE, for appellants Rothschild & Co. and Edward Morris.

CLARENCE A. KNIGHT, and WILLIAM G. ADAMS, for appellant the Northwestern Elevated Railroad Company.

EDWIN WHITE MOORE, (JAMES HAMILTON LEWIS, Corporation Counsel, of counsel,) for appellees:

Public grants are construed strictly against the grantee, and are held to confer no powers except such as are set forth in clear and explicit terms. *Railway Co.* v. *Railway Co.* 130 U. S. 26; *Charles River Bridge case,* 11 Pet. 440; *People* v. *Railroad Co.* 120 Ill. 48; *Railway Co.* v. *Chicago,* 121 id. 176; *Snell* v. *Chicago,* 133 id. 426; *Railroad Co.* v. *Chicago,* 203 id. 576; *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 666; *Goddard* v. *Railway Co.* 202 Ill. 368.

The rule of *ejusdem generis* would exclude the construction placed on this ordinance by the court. *Shultz* v. *Cambridge,* 38 Ohio St. 659; *Shirk* v. *People,* 121 Ill. 61; *State* v. *Black,* 75 Wis. 492; *People* v. *Richards,* 108 N. Y. 137; *McDade* v. *People,* 29 Mich. 54; *Brooks* v. *Cook,* 44 id. 617; Potter's Dwarris on Stat. 247, 248; *Railway Co.* v. *Chicago,* 121 Ill. 176; *In re Swigert,* 119 id. 88; *Gundling* v. *Chicago,* 176 id. 345.

The rights and privileges of the railroad company were exhausted in the matter of construction upon the completion of the railroad in accordance with the plans and specifications first filed with the commissioner of public works, and no additions could thereafter be made without a new franchise from the city council. *Concord* v. *Railroad Co.* 65 N. H. 30; *Railroad Co.* v. *Middlecoff,* 150 Ill. 28.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The circuit court of Cook county granted the prayers of the bill of Rothschild & Co. and Edward Morris and the cross-bill of the Northwestern Elevated Railroad Company, and entered a decree enjoining the city of Chicago and its officers, the defendants in said bills, from tearing down, destroying or injuring the platform or passageway connecting the building occupied by Rothschild & Co., on the north-east corner of State and VanBuren streets, in said city, with the elevated railroad structure in VanBuren street, and from interfering with the maintenance and use thereof during such time as said railroad company or its successors or assigns shall have the right to maintain and operate said elevated railroad structure in said street, and shall have the right to use the interior of said building as a waiting room, and the aisles, stairways and passenger elevators and the entrances and exits of said building, for the accommodation and convenience of its passengers. The Appellate Court for the First District reversed the decree and dismissed the bill and cross-bill for want of equity. From the judgment of the Appellate Court the complainants in the bill and cross-bill severally appealed to this court.

The facts are as follows: The Northwestern Elevated Railroad Company, complainant in the cross-bill, is organized under the general act for the incorporation of railroad companies, and is possessed of the powers and privileges of general commercial railroad companies organized under that act. It owns and operates an elevated railroad encircling the central business portion of the city of Chicago and known as "the loop." The elevated railroad was constructed by the predecessor in right and title of said company under an ordinance of the city of Chicago granting a license to occupy for that purpose the streets in which it was built. The loop is for the use of said company and

four other railroad companies, and the ordinances relating thereto were accepted by the respective corporations, bonds were filed, and the conditions of payment of compensation to the city, and all other conditions, have been complied with. The ordinances so passed and accepted form the con-- tract which governs the rights of the parties. An ordinance passed June 29, 1896, granted to the predecessor of the Northwestern Elevated Railroad Company permission and authority to construct and maintain that part of the loop in VanBuren street, and to construct and maintain in the route thereby authorized "all necessary or proper stations, plat- forms and depot stations that connect the same by means of all necessary stairs, stairways, elevators, landing places and other constructions and appliances for ingress, egress and the accommodation of passengers, but such platforms, sta- tions, stairs, stairways, elevators, landing places, etc., shall be so constructed and maintained as not to unnecessarily impair the usefulness of such avenue or any portion there- of." The ordinance contained this further provision: "Nothing herein contained, however, shall prohibit said company from locating and maintaining its stations in buildings purchased, leased, or erected on ground purchased or acquired by condemnation or lease, or in buildings ad- jacent to said stations or platforms, where authority is given by owners or lessees of said buildings for above purposes, wherein it may, for the convenience and comfort of its pa- trons, place its ticket offices, waiting rooms, sanitary accom- modations, stairways, elevators; and all requisite methods of ingress and egress, and the right to construct and main- tain covered passageways, or connections between the inte- rior of all such station buildings and the exterior platforms, is hereby expressly granted to said company." The ordi- nance fixed the location of stations along the route, one of which was to be located at or near State and VanBuren streets. The station was located at that place and con- structed with platforms and four stairways, one at each cor-

ner, leading up and down from the sidewalks. After that station had been completed the railroad company filed with the commissioner of public works plans for the passageway in question leading from the platform above the street into the second story of the building occupied by Rothschild & Co., in pursuance of a contract with Rothschild & Co. for the construction of the same. The building faces Van-Buren street on the south and is adjacent to the station, so that the passageway leads directly into and through the building. It is occupied as a department store and is seven stories high, fronting eighty feet on VanBuren street and three hundred and sixty feet on State street. It has an entrance from VanBuren street and a number of entrances from State street. The commissioner of public works issued the permit asked for to locate and maintain the necessary connections between the elevated structure and the building, on July 26, 1897. The railroad company contracted for the manufacture of the steel and iron and materials for the construction of the passageway and connection, and the same were manufactured and on hand, when in September, 1897, the permit was revoked and notice of the revocation was given to Rothschild & Co. Afterward, on December 13, 1897, the city passed an ordinance declaring the construction of passageways, bridges, platforms and structures, of any kind or nature whatsoever, connecting or joining the elevated roadway with adjacent buildings a public nuisance, a menace to health and contrary to law and to the rights of the public, and ordering the same torn down where already built and prohibiting any such structure. This suit followed for the purpose of restraining the city from enforcing that ordinance. A similar passageway had been built on the opposite side of VanBuren street from the station to the store of Siegel, Cooper & Co., and there was a passageway to the store of Schlesinger & Mayer on Wabash avenue, and another to the Lake Shore and Michigan Southern depot. The railroad company opened negoti-

227—14

ations with the city respecting this passageway, and it was agreed by the city officials in charge of the matter that the city would grant the privilege for the passageways to the three stores for a yearly rental of $1500 each. Siegel, Cooper & Co. executed a lease prepared by the city and returned it with a check for $1500, but Schlesinger & Mayer and Rothschild & Co. declined to pay, and the check was sent back to Siegel, Cooper & Co. and the agreement was canceled as to all. The passageway in this case was then built under the protection of the injunction.

The passageway leads directly to the second floor of the building and into a waiting room provided with chairs and seats for the use of the passengers. From the waiting room there is a large main aisle running directly through the building from the south to the north, crossed by other aisles to seven different stairways and four sets of elevators affording passage through the store to the street, and there are six street entrances, on all of which are signs as follows: "Entrance to all Elevated Railroads." The store building is open for business from eight o'clock in the morning until six o'clock in the evening, and during that time the public have unrestricted ingress and egress through the building to the station and the use of the elevators, waiting room and sanitary appliances. Passengers coming into the store may take the passenger elevators and avoid climbing the stairways in the street, and there are ample sanitary appliances open to the use of the general public. Upon the hearing it was stipulated and made a part of the decree that the public have the right to and may use the passageways and aisles in said building, including the elevators and stairways, in going to and from the platform and connecting passageway, and that the railroad company has the right to control the same for the use of its passengers. In the passageway there is a ticket office for the Metropolitan elevated railroad, which carries the greater part of the business at that place. The passage contains two stairways, one

leading to the Metropolitan station and another to a subway from which the other platforms are reached. Rothschild & Co. paid the expense of building the passageway and connections and pays the wages of the ticket seller. The bridge does not obstruct light and air or any other easement to any building except the Rothschild building, and it in no manner interferes with the use of the street for vehicles or foot passengers upon the sidewalk. The railroad companies using the loop do an immense passenger business. There are about 325,000 passengers daily around the loop, of which the Metropolitan carries about 115,000 and the South Side elevated about 85,000. The Metropolitan has a train around the loop every minute and one of the other roads as frequently. The track is full of trains during certain hours of the day, and the four stairways from the sidewalk will not accommodate all the people. During the busy parts of the day they are constantly crowded, and the passageway allows a portion of the passengers ingress and egress through the building, avoiding the crowd at the street corner and the crowded stairways. The stairways are four feet wide and occupy that much of the sidewalks, partially obstructing the same. The arrangement is an especial convenience to the infirm, who are enabled to use the elevators in preference to climbing the stairs, and also to persons who desire to use the waiting room and other appliances in the building. There are from 3000 to 4000 people who use the passageway daily, and on occasions there are many times that number who use it in a day. At least one-third of the passengers who come through the building do not do any trading but come that way because it is more convenient than the street stairways, and this is especially so in case of storm or bad weather. The city officials have not regarded the passageway as a public nuisance, a menace to health or contrary to law and the rights of the public, as declared by the ordinance, since they were willing and offered to enter into a contract grant-

ing the privilege for a rental of $1500 per annum. It can not be admitted that they would endanger the public health or authorize what in fact would be a public nuisance merely to add to the income of the city. The alternative offered was to either pay rental or have the passageway torn down, which latter, instead of being a benefit to the public, would be a distinct injury.

The circuit court by its decree found that the passageway was a necessary appliance and construction permitted by the provisions of the ordinance recited above, for the ingress and egress of the public to and from the elevated railroad structure. Counsel for appellees insist that the structure cannot be called an appliance, and that if the finding is sustained all the buildings along the line of the road may be made appliances for the ingress and egress of passengers. Whether the passageway is an appliance or not, it is certainly a construction and for the ingress and egress of passengers, and it does not follow that the railroad company could make connections with buildings all along the line of its road and call them stations. Neither is it at all likely that the railroad company would seek to assume the responsibilities toward its passengers which the law imposes in respect to stations, by making such connections. The authority granted is to construct and maintain stations and platforms and means of ingress and egress, and the ordinance fixes the location of the stations, one of which is at the place in question, and this means of ingress and egress to and from that station does not impair the usefulness of VanBuren street in any degree. The railroad company by its charter has full power to erect and maintain all necessary and convenient buildings and stations for the accommodation of its passengers or which may be necessary in the construction or operation of its railroad. It has no right to occupy any public street of the city of Chicago without the consent of the city, and the license or consent may be granted upon any terms which the city may see fit

to impose.   When a railroad asks the city for a license to occupy its street, the city may impose restrictions as to the location and character of stations or restrict in any manner the enjoyment of powers which the railroad company would otherwise have.   If the license is accepted the railroad company is bound by the condition upon which it is granted, but if there is no condition or restriction the railroad company may unquestionably provide such means of ingress and egress and such accommodation for its passengers as are mutually agreeable to the parties concerned.   The railroad company must find its authority to occupy the street and erect the passageway over it in the license or grant from the city, but the grant is to construct and maintain a station at State and VanBuren streets and to connect its station by necessary construction and appliances for ingress and egress and the accommodation of passengers.

But whether the decree of the circuit court can be sustained on that ground or not, we are of the opinion that the railroad company does maintain a station in the Rothschild building and that the decree was correct for that reason.   Counsel for appellees insist that the station must be the property of the railroad company, and contain its ticket office, waiting room, sanitary appliances, stairways, elevators, etc., while, in fact, all those things are owned by Rothschild & Co. and are cared for and kept in order by that company.   The passageway is a benefit to Rothschild & Co. as a corporation by bringing the public through its store and increasing its trade and business, and in consideration of such benefit it paid for the building of the passageway and provides the waiting room and other conveniences. But that fact does not determine the use of the property. A railroad has the character of a public highway and the corporation exercises the power of eminent domain for the public use, although the ownership of the property is in the company and not the public, and the public have no share in the profits of the business.   The city could not grant the

right to construct and maintain the passageway for a private use. But the use is not confined to the customers of Rothschild & Co. or to those who it may consent shall use it. It is for the free and unrestricted use of the public at large. The public are supplied with all the conveniences that attend a station or are required in connection with it, and the arrangement between the railroad company and Rothschild & Co. does not in any manner interfere with the public or the public use. The waiting room is one of the ordinary conveniences of a station, and all persons have the use of the sanitary appliances and the stairways and elevators in the store. The railroad company has control of the premises as a station and assumes the corresponding duties and obligations to passengers. The ticket office is in the passageway and not in the building or waiting room, but we do not see that such fact makes the uses of the building private rather than public. The railroad company could not occupy the street without the consent of the city and must comply with all conditions which the city saw fit to impose, but it seems to us that the arrangement made is not in violation of any condition but is in harmony with the conditions prescribed in the ordinance.

If the passageway was, in fact, an unlawful obstruction the city would not be deprived of its right to remove it by the agreement to permit its construction and use for a money consideration, and it is not estopped by having made the proposition, which was not accepted; but the proposal shows the light in which the passageway was actually considered by the city officials, and that its removal was not demanded as a menace to public health or as a nuisance. The uncontradicted evidence is that it is a great public benefit and convenience and its removal would be a public injury. It is true, the passageway is only open for public use when the store is open; but the fact that it is not a greater benefit by being kept open all the time does not detract from the actual benefit conferred by it.

The question whether Rothschild & Co. or Edward Morris alone would be entitled to relief against the proposed destruction of the passageway is not now important, since the railroad company filed a cross-bill and set up its claim.

The judgment of the Appellate Court is reversed and the decree of the circuit court is affirmed.

*Judgment reversed.*